UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED

RECEIPT # _____
AMOUNT $ ___N/A_____
SUMMONS ISSUED Y - 3
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK __er__
DATE ___9-30-02___

---

SECURITIES AND EXCHANGE COMMISSION

Plaintiff,

v.

ARTHUR A. GOODWIN,
WILLIAM J. BURKE and
CHRISTOPHER P. WHALEN,

Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No.

02 CV 11913 JLT

JURY TRIAL DEMANDED

---

## COMPLAINT

Plaintiff, Securities and Exchange Commission ("Commission") alleges the following against defendants Arthur A. Goodwin ("Goodwin"), William J. Burke ("Burke") and Christopher P. Whalen ("Whalen"):

### Summary

1.  This enforcement action involves a $9 million revenue recognition fraud at Interspeed, Inc. ("Interspeed or "the company"), a now defunct Massachusetts Internet equipment provider. Interspeed falsely overstated its revenue by 25% to 93% in quarterly reports for the periods ended December 31, 1999, March 31, 2000 and June 30, 2000, and in a Form S-8 registration statement filed with the Commission in August 2000.

2.  Shortly after Interspeed went public in September 1999, Goodwin, Interspeed's senior vice-president of world-wide sales, initiated a scheme to inflate revenue in order to meet analysts' revenue expectations and to boost his own revenue-based compensation. Goodwin

used two techniques to effectuate his scheme. First, he arranged several sales transactions with customers which included secret side letter agreements relieving the customer of any obligation to pay for the goods unless the customer resold them to an end-user. Whalen, a senior vice-president of sales who reported to Goodwin, created one of these side letters at Goodwin's urging. Second, Goodwin forged a signature on a contract and inserted language into it in order to make it appear that a customer had the financial ability to pay for a $6.4 million purchase of goods from Interspeed although in fact the customer had virtually no assets. As a result of Goodwin's fraudulent scheme, Interspeed improperly recorded approximately $9 million in revenue on transactions for which its customers had either no obligation or no ability to pay, failing to conform to generally accepted accounting principles ("GAAP") governing the recognition of revenue.

3.    Burke, the company's chief financial officer, recorded as revenue the contingent sales Goodwin arranged, even though he was aware of the side terms which made revenue recognition improper. Burke also altered accounting records to keep Interspeed's outside auditors from discovering that the sales were shams. He did so to make it appear that Interspeed was receiving payment for the sales when in fact Interspeed itself was providing funds to the customer to make the payments, a fraudulent practice known as "round-tripping."

4.    As a result of the revenue recognition fraud, Interspeed filed materially false statements with the Commission and issued materially false press releases when reporting its financial results for each of three quarters. Interspeed overstated its reported revenue by approximately 35% for the quarter ended December 31, 1999 and by approximately 25% for the

2

quarter ended March 31, 2000.  For the quarter ended June 30, 2000, Interspeed overstated its revenue by 93%.

5.        Interspeed's board of directors uncovered the fraudulent scheme in September 2000.  As a result, the company restated its financial results for the first three quarters of its 2000 fiscal year, reducing its total reported revenue for the three quarters from $14.1 million to $5.4 million.

6.        By engaging in the acts alleged in this complaint, Goodwin, Burke and Whalen directly or indirectly violated, or aided and abetted violations of, the antifraud, books and records, internal controls and reporting provisions of the federal securities laws, and unless enjoined by this Court will continue to do so.

7.        Accordingly, the Commission seeks: (i) entry of a permanent injunction prohibiting the defendants from further violations of the relevant provisions of the federal securities laws; (ii) disgorgement of revenue-based bonuses as ill-gotten gains; (iii) the imposition of a civil monetary penalty against each defendant due to the egregious nature of their violations; and (iv) entry of an order barring Goodwin and Burke from serving as officers or directors of a public company.

## JURISDICTION AND VENUE

8.        The Commission seeks  permanent injunctions pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(1)].  The Commission seeks imposition of civil monetary penalties pursuant to pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  The

Commission seeks an officer and director bar pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)].

9.      This Court has jurisdiction over this action under Section 22 of the Securities Act [15 U.S.C. § 77v] and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa]. Venue is proper in the District because, at all relevant times, Interspeed's corporate headquarters were located in Massachusetts, many of the acts and practices alleged in the Complaint occurred in Massachusetts and several of the Defendants lived in Massachusetts at the time of the acts and practices alleged in the Complaint.

10.     In connection with the conduct alleged, defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, of the mails, or of the means or instruments of transportation or communication in interstate commerce.

## Defendants and Related Entity

11.     Interspeed was at all relevant times a Delaware corporation with its headquarters in North Andover, Massachusetts. The company, which was a subsidiary of Brooktrout, Inc., went public on September 23, 1999. The company's stock was traded on the NASDAQ national market system and was, at all times relevant to the allegations herein, registered with the Commission pursuant to Section 12(g) of the Exchange Act [15 U.S.C. §781(g)]. The company was delisted on January 31, 2001 and on February 13, 2001, Interspeed filed a Form 15 de-registering its stock with the Commission. Interspeed has ceased operations and assigned its assets to creditors.

12.     Goodwin became employed at Interspeed in September 1999, as vice-president of major accounts. In December 1999, he was promoted to the newly-created position of senior

4

vice-president of worldwide sales.  Interspeed terminated Goodwin as an employee in October 2000.

13.     Burke served as Interspeed's CFO from May 1999 until he left the company on August 24, 2000.

14.     Whalen became employed at Interspeed in January 1998, as the director of national sales.  In January 1999, he was made the vice president of sales and marketing. Interspeed terminated Whalen as an employee in October 2000.

### Facts

### Interspeed Goes Public and Establishes an Ambitious Financial Plan for its First Year as a Public Company

15.     Interspeed was formed in 1997 as a subsidiary of Brooktrout, Inc., an Internet communications manufacturer, to develop products for digital subscriber line ("DSL") access. At the time it went public, in September 1999, Interspeed had never earned a profit.

16.     Interspeed had announced anticipated revenues of approximately $1.1 million for the quarter ending September 30, 1999, which was the end of its fiscal year.  The company failed to meet these projections, announcing on October 4, 1999, that its quarterly revenue would be only $625,000.  At an October 18, 1999 meeting of Interspeed's Board of Directors, members of the Board expressed dissatisfaction with the revenue report.  The Board also approved an ambitious financial plan for Fiscal Year 2000 ("FY 2000") that provided a revenue target of $19 million, with escalating quarterly targets of $3 million (Q1), $4 million (Q2), $5.2 million (Q3) and $6.8 million (Q4).

17.     In December 1999, Interspeed promoted Goodwin to the position of senior vice-president of worldwide sales, replacing Whalen as head of sales for the company. The personnel change was prompted by Interspeed's failure to meet its revenue target for the previous quarter.

18.     For FY 2000 the company had a bonus plan that called for Burke to receive a bonus of up to $90,000 for the fiscal year. One-half of Burke's bonus was tied to revenue and was not to be paid until audited numbers for the fiscal year were available. If revenue for FY 2000 was less than $17.6 million, Burke would not receive any of the revenue-related component of the bonus. The bonus plan also provided that Goodwin would receive a bonus equal to .75% of revenue, per quarter, and that Whalen would receive a bonus equal to .375% of revenue, per quarter.

## Goodwin Enters Into a Secret Side Letter Agreement With Solunet, Inc. That Results in Interspeed Fraudulently Recognizing $1.2 Million in Revenue in the First Quarter of FY 2000

19.     Shortly after taking over the sales department, Goodwin asked an Interspeed sales manager to persuade Solunet, Inc. ("Solunet"), one of his accounts, to "take" $1.2 million in inventory until another Interspeed customer Goodwin was working with bought the inventory shortly after the new year. Goodwin explained to the sales manager that it was important to receive the order from Solunet because Interspeed's quarter ended December 31 and the company needed to show "the street" that it had shipped a substantial amount of product. Goodwin also told the sales manager that Solunet would not be obligated to pay Interspeed until the end customer actually purchased the product from Solunet. Goodwin then e-mailed to the sales manager the list of inventory that he wanted to ship to Solunet.

6

20. The sales manager relayed Goodwin's request and the payment terms to Solunet's vice-president of sales. On December 22, 1999, Goodwin put the contingent payment terms in a letter that he signed and faxed to Solunet. In the letter, Goodwin stated that Solunet had no obligation to pay Interspeed unless it resold the product to the end customer. Goodwin did not disclose the existence of the side letter agreement at that time to officials at Interspeed responsible for the company's quarterly financial reporting. The equipment was shipped by the end of the quarter and Interspeed recorded revenue of $1.2 million on the transaction allowing the company to report quarterly revenue of $3.1 million, exceeding the $3 million target for the quarter ended December 31, 1999.

21. At some point in January 2000, Burke called the sales manager to inquire about the status of Solunet's December 1999 receivable which, by the invoice terms, was due on January 22, 2000. The sales manager told Burke about the agreement by which Solunet did not have to pay Interspeed until it resold the product and received payment from the end user.

22. Despite having been informed that the revenue from the $1.2 million Solunet transaction was contingent and, therefore, knowing that it had been improperly booked, Burke signed a quarterly report on Form 10-Q for the quarter ended December 31, 1999, which reported that Interspeed's revenues equaled $3.151 million, which included the $1.2 million Solunet transaction. The Form 10-Q was filed with the Commission on February 14, 2000. Interspeed also announced in a press release on February 3, 2000, that its quarterly revenues were $3.151 million.

7

**Goodwin, Burke and Whalen Arrange a Round-Tripping Payment That Enables Solunet to Make Payments On the Goods Shipped to It in the December 1999 Transaction**

23.　During the next quarter, Goodwin orchestrated a series of steps to make it appear that payment was being made on the goods shipped by Interspeed to Solunet. By March 2000, it became clear these goods would not be resold to the end customer that Goodwin had promised Solunet. Instead, Goodwin attempted to arrange the purchasing or leasing of these goods by a second company, I-Way, Inc. ("I-Way"), as a substitute for the previously planned end user.

24.　Goodwin took steps to ensure that the I-Way deal was completed before the end of March 2000 so that Interspeed's books would reflect payment for the goods it had shipped to Solunet in December 1999, making the transaction appear to be a valid sale. I-Way did not have the financial ability to buy any of the goods from Solunet outright or to engage a leasing agent through which it could lease the products. Goodwin therefore arranged to transfer funds directly from Interspeed to I-Way. I-Way was to use the funds to make lease payments to a leasing agent. The leasing agent would buy from Solunet the Interspeed goods that had been shipped to Solunet in the previous quarter in the contingent sales transaction. Solunet would then pay Interspeed for the goods it sold to the leasing agent. In this way, Interspeed caused the funds it sent to I-Way to make a "round-trip" back to Interspeed. The last stage in the round-trip, the payment from Solunet to Interspeed, would make it appear that the previous quarter's sales transaction was valid and properly recognized as revenue.

25.　Under generally accepted accounting principles, Interspeed's round-trip payments would make recognition of revenue on the transaction improper. Accordingly, Goodwin planned to disguise the funds transferred from Interspeed to I-Way as Marketing Development Funds

8

("MDF").  Interspeed previously had used MDF funds as payments to customers to help them market resales of Interspeed equipment they had already bought and paid for.  In this instance, however, I-Way had not actually purchased anything and the money was not to be used for marketing.  Instead, the money was transferred for the sole purpose of allowing I-Way to make lease payments in a "round-trip" arrangement in which the Interspeed money was used to pay for Interspeed products, concealing the contingent nature of the $1.2 million sale Interspeed had included in revenue in the previous quarter.

26.     On March 24, 2000, Goodwin told Whalen to complete a form requesting that a $26,251.64 check be issued to I-Way.  This equaled the amount I-Way owed on its first lease payment to the leasing agent who bought the Interspeed equipment from, and made payments to, Solunet.  Goodwin and Whalen took the form to Burke for his signature.  Goodwin specifically told Burke, in Whalen's presence, that the purpose of the payment was to fund I-Way's lease of the equipment sold to Solunet.  Burke told Goodwin to change the amount to an even $30,000 so as not to "raise any red flags" that might reveal that the purpose of the payment was to fund the I-Way lease payment.  Whalen completed a new form with the even amount and Burke wrote "OK after discussion with Art Goodwin" and signed his name.

27.     To ensure that the payment on the Solunet receivable was made before the end of the quarter, Whalen flew to California with the check and assisted I-Way in obtaining the lease through which I-Way could obtain the Interspeed product from Solunet.  Whalen also assured I-Way that Interspeed would continue to help the company make its lease payments.  Solunet then sold $300,000 of the Interspeed product it was holding to a leasing company, which then leased the product to I-Way.  On March 31, 2000, Solunet sent a $300,000 check to Interspeed as partial

9

payment on the December 1999 receivable. Interspeed subsequently made two more payments to I-Way, one for $30,000 and the other for $16,000. Burke signed off on each of these payments by writing "OK" and signing his name.

### Goodwin Enters Into a Second Secret Side Letter Agreement With Solunet, Inc. That Results in Interspeed Fraudulently Recognizing $1 Million in Revenue in the Second Quarter of FY 2000

28.     During the quarter ended March 31, 2000, Goodwin created a second agreement with Solunet under which Solunet accepted Interspeed product on the condition that it have no commitment to pay until the goods were resold. Goodwin told the Solunet representatives that if Solunet were willing to do another deal with Interspeed, Interspeed would give the company an additional 5% discount over its previous discount and would issue Interspeed warrants to Solunet. Having received those commitments from Goodwin, Solunet agreed to take approximately $1 million of additional inventory from Interspeed.

29.     Goodwin then provided Solunet with a signed side letter dated March 31, 2000, which stated, "Solunet will not be required for payment on inventory that has been ordered for [end customer] until payment has been received by [end customer]"[sic]. Goodwin also sent an agreement to Solunet granting the company warrants to purchase 5,000 shares of Interspeed stock at any time from February 2, 2001, one year from the date of issuance, until February 2, 2005, at a price of $21.25 per share. The agreement also provided for the issuance of an additional 10,000 warrants to Solunet for each future $1 million in purchases from Interspeed. Burke was involved in putting together the warrant package for Solunet and he reviewed the warrant terms with the board of directors at its meeting on February 15, 2000, shortly after the warrant

10

agreement was executed. Burke did not, however, tell the board what he knew about the contingent payment arrangements.

30.   On April 18, 2000, Interspeed announced second quarter revenue of $4.03 million, exceeding the revenue target of $4 million. On May 15, 2000, the company filed its quarterly report on Form 10-Q, signed by Burke. 23 % of the reported revenue was from the March 2000 Solunet secret side letter transaction.

### Goodwin and Whalen Enter Into a Secret Side Letter Agreement With Lastar.com That Results in Interspeed Fraudulently Recognizing $362,900 in Revenue in the Third Quarter of FY 2000

31.   On May 11, 2000, Burke made a presentation to Interspeed's board of directors concerning revenue targets for the second half of FY 2000. He proposed increasing the third quarter revenue target from $5.2 million to $5.6 million and the fourth quarter target from $6.8 million to $7.3 million. The proposal also contained an analysis that compared the revenue target to those set by four brokerage houses that followed Interspeed. All of their analysts reported expected revenue numbers below the revised figures.

32.   Sometime in late June, Goodwin told Whalen that although the sales numbers for the third quarter of the fiscal year (ending June 30) were in good shape, the company needed some backlog numbers to show that there were additional sales in the pipeline. This was particularly important, he explained, because the sales for the current quarter derived primarily from a single high-dollar transaction with an Australian customer, Intelligent Public Network ("IPN").

33.   At Goodwin's direction, Whalen called the CEO of Lastar.com ("Lastar") an existing Interspeed customer with whom Whalen had a good business relationship. Whalen asked the CEO to take some goods from Interspeed. Lastar's CEO agreed, but only if his

11

company was protected from having to pay for goods that it did not ultimately want, and asked

that the terms of the transaction be in writing.  Whalen went to Goodwin and asked if that were

possible.  Goodwin told Whalen that side letters making sales contingent were accepted practice

and  that Goodwin had written two such letters in connection with Solunet transactions.

34.     Whalen then arranged that Lastar would accept goods worth approximately

$363,000 from Interspeed on a contingent basis.  Whelan drafted and signed a side letter to

Lastar providing that Lastar did not have to pay for the goods unless it resold them and could

return the goods at Interspeed's expense if it was unable to sell them.  After Goodwin reviewed

and approved the letter, Whalen faxed it to Lastar on June 28, 2000 and Lastar then faxed back a

signed purchase order for the goods.

35.     After Whalen had faxed the letter and received a signed purchase order from

Lastar, Goodwin told Whalen that Interspeed needed to actually ship the Lastar goods because

Interspeed needed to report more revenue.  Goodwin told Whalen not to worry about the right of

return provisions in the letter to Lastar because Burke and Interspeed's President were in

agreement that shipping the goods was the right thing to do.  Before the end of the quarter,

Interspeed shipped the goods to Lastar and recognized $362,900 revenue on the transaction.

### Goodwin Falsifies a Contract Resulting in Interspeed Fraudulently Recognizing $6.4 Million in Revenue from the Intelligent Public Network ("IPN") Transaction in the Third Quarter of FY 2000

36.     In the Spring of 2000, Goodwin began negotiating a sale to IPN, a new Australian

company that was involved in designing and installing the Internet in Australia.  The proposed

terms called for IPN to purchase 100 pieces of Interspeed hardware used in transmitting Internet

traffic, known as DSL Subscriber Line Access Multiplexors, or DSLAMs, for a total cost of $6.4

million.  Interspeed's finance department was concerned about IPN's ability to pay for the goods

12

and refused to release the automatic credit hold applied to all purchase orders until it was established that the customer had the financial ability to pay for the product sold. Goodwin, however, told Burke that an Australian subsidiary of Compaq Computer Corporation would be buying the DSLAMs from IPN, which would give IPN the financial ability to pay Interspeed. Goodwin promised Burke that documentation establishing Compaq's involvement would arrive shortly.

37.     By late June 2000, Goodwin had not produced the promised documentation. Goodwin again assured Burke that it would arrive shortly and, after discussing the matter to some extent with other officials at Interspeed, Burke signed a release allowing the goods to be shipped. Burke approved the shipping so that Interspeed could, once the documentation arrived, record the $6.4 million in revenue for the quarter ended June 30, 2000.

38.     On Monday, July 17, 2000, Interspeed's auditors were to complete their review of financial results for the quarter ended June 30, 2000. On Friday, July 14, Goodwin faxed a document to Burke purporting to show Compaq's agreement to buy Interspeed product from IPN. Goodwin had fraudulently altered the document by altering a proposed contract to which he had access. The proposed contract was between Compaq and an Australian company, UeComm, and concerned their joint efforts to set up the Australian Internet. In order to do that, they would need equipment to transmit Internet communications, either Interspeed's DSLAMs that had been recently purchased by IPN, or some competitor's hardware. Although UeComm and Compaq had discussed using Interspeed's DSLAMs, by July 14, 2000 no decision had been made or agreement reached. In connection with the discussions between UeComm and Compaq, however, contract drafts had been created with language referring to use of Interspeed's DSLAMs and bearing the signature of a Compaq employee. These drafts had never been

13

finalized and had never been signed by both parties because it was never agreed that either of the

parties would buy the Interspeed DSLAMs from IPN.

39.     Goodwin falsified a draft contract by inserting the following language:

> UE Comm will deploy 25 ISPD DSLAMs and 1000 Flowpoints for
> the first phase of deployment. The second phase will include 75
> ISPD DSLAMS and 8000 CPE devices. Compaq will be
> purchasing all DSLAM equipment and CPE devices from IPN.

40.     The fraudulent contract created by Goodwin still lacked the signature of a

UeComm representative.  Goodwin, knowing the name of the UeComm representative, forged

that person's signature. He then faxed the altered contract to Interspeed,  representing it to be the

documentation of IPN's ability to pay, as it indicated that IPN would be selling the Interspeed

goods to Compaq.

41.     Burke met with Interspeed's auditors shortly after receiving the altered contract.

When reviewing with them the IPN transaction which accounted for 92% of the company's

recorded quarterly revenue, Burke produced the altered contract that had been provided to him by

Goodwin. He informed the auditors that this document made recognition of revenue on the

transaction proper, since IPN's ability to pay the $6.4 million price was established by the

contract language indicating that Compaq was to buy the Interspeed DSLAMs from IPN.

42.     On July 20, 2000, Interspeed announced record third quarter revenue of just over

$7 million, exceeding the revised target of $5.6 million by 25%.  On August 7, 2000, the

company filed its quarterly report on Form 10-Q signed by Burke. 97% of the reported revenue

was made up of the Lastar secret side letter transaction and the bogus IPN sale.

43.     Compaq never actually entered into any contract to buy the Interspeed DSLAMs

from IPN, nor did it ever buy any of the Interspeed product shipped to IPN.  As a result, IPN

14

never made any payments to Interspeed.  Interspeed never received any of the $6.4 million in revenue from that transaction that it reported in its quarterly financial results.

### Burke Resigns and Collects His Revenue Bonus

44.     On July 27, 2000, Burke told Interspeed's president that he was resigning to take a job at a small private company, saying he wanted a change from the pressures and stress of being CFO of a public company.

45.     On August 24, 2000, Burke's last day at Interspeed, he signed a Form S-8 registration statement registering shares for the company's Stock Option and Grant Plan.  The registration statement, which was filed with the Commission the same day, incorporated by reference Interspeed's fraudulently inflated financial results for the previous three quarters. Burke knew or was reckless in not knowing that these financials were inaccurate because they contained revenue that had been improperly recognized.  At the time he left, Burke received a $48,750 bonus.  Of that amount, $41,250 was based on the company's overstated revenue.

### The Audit Committee Investigates Revenue Recognition Practices at Interspeed

46.     At a regularly scheduled Interspeed board meeting on September 14, 2000, Goodwin made a presentation projecting that the company revenue for the last quarter of the fiscal year would be $7 million, just short of the $7.3 million goal.  The board learned, however, that product shipments up to that point in the quarter represented only $250,000 of this projected quarterly revenue figure, leaving only 16 days in the quarter to sell and ship over $7 million of goods.  According to Goodwin's presentation to the board, one of the largest orders due in that period was a $3.7 million order from Lastar.  Goodwin did not tell the board that the purported Lastar sale was subject to a secret side letter dated September 11, 2000, prepared at Goodwin's

15

direction, signed by Whalen and initialed by Goodwin after Goodwin's review and approval. The side letter relieved Lastar of any obligation to pay for the goods unless it resold them.

47.     Shortly after the meeting, the members of the audit committee of the board asked the CFO of Interspeed's parent Brooktrout to investigate revenue recognition practices at Interspeed. The CFO agreed to the committee's request.

48.     On September 21, 2000, Brooktrout's CFO met with Goodwin and asked him if there were any contingencies associated with the $3.7 million Lastar order. Goodwin replied that there were no contingencies other than the fact that Interspeed agreed to send new business to Lastar.

49.     Brooktrout's CFO then brought Whalen, the sales person involved in the Lastar transaction, into the meeting with Goodwin. He asked Whalen if there were any contingencies on the Lastar order and Whalen told him about the September 11, 2000 letter. Whalen left the meeting to get his copy of the September 11, 2000 letter with Goodwin's initials. Goodwin followed Whalen to his office and pleaded with Whalen not to show the CFO the copy of the letter with Goodwin's initials. Whalen refused. Whalen brought back both the September 11, 2000 letter and the June 23, 2000 side letter with Lastar for the third quarter transaction.

50.     Brooktrout's CFO informed Interspeed's board members about the side letters with Lastar. The Board formed a special committee to further investigate the matter and the committee hired outside counsel to perform an initial investigation. On October 6, 2000, Interspeed publicly announced that there might have been inaccuracies in its filed financial statements for the first three quarters of the company's 2000 fiscal year and that its fourth quarter revenue, which had been expected to be approximately $6 to $7 million, would only be approximately $660,000. The company also announced that Goodwin's and Whalen's employment had been terminated.

Interspeed's stock price fell 54% from a closing price before the announcement of $3.843 to a closing price, the next trading day, of $1.75.

51.     On November 29, 2000, Interspeed filed amended Forms 10-Q restating revenue for the first three quarters of its fiscal year 2000. Interspeed's reported revenue for the period decreased 60% from $14.1 million to $5.4 million.

52.     During the period he engaged in the fraudulent revenue recognition scheme, Goodwin received a bonus of $111,000, representing a .75% commission on the falsely inflated revenue of $14.1 million for the three quarters. Of the $111,000, Goodwin received $70,500 based on revenue improperly recognized as a result of his fraudulent conduct. Whalen received a commission of approximately $1,360 based on the contingent sale to Lastar he arranged on which $363,000 in revenue was improperly recognized.

### FIRST CLAIM FOR RELIEF
### (Violation of Section 17(a) of the Securities Act by Goodwin, Burke and Whalen)

53.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-52 of the Complaint as if set forth fully herein.

54.     As set forth above, Goodwin substantially participated in Interspeed's filing of materially misleading Forms 10-Q for the first, second and third quarters of FY 2000, and a materially misleading Form S-8 registration statement, which was signed and filed on or about August 24, 2000, incorporating the quarterly results. Goodwin knew, or was reckless in not knowing, that these filings were materially misleading because, among other things, he was aware that revenue was being recognized by Interspeed in those Forms 10-Q and the Form S-8 on transactions with Solunet and Lastar where there was no payment obligation by the customer. Goodwin also knew, or was reckless in not knowing, that revenue was being recognized by Interspeed in its Form 10-Q for the second quarter of FY 2000 and in its Form S-8 registration statement despite the existence of a "round-tripping" arrangement with I-Way. Goodwin also

knew, or was reckless in not knowing, that revenue was being recognized by Interspeed in its Form 10-Q for the third quarter of FY 2000 and in its Form S-8 registration statement because of the last-minute production of a purported contract by him that supposedly substantiated the ability of a customer to pay for shipment of product by Interspeed, when he knew that the purported contract was a forgery and fraudulent because he had created it.  Goodwin knew or was reckless in not knowing that Interspeed's misstated financial results would render the company's public filings materially misleading.

55.     As set forth above, Burke signed Interspeed's materially misleading Forms 10-Q for the first, second and third quarters of FY 2000, and a materially misleading Form S-8 registration statement, which was signed and filed on or about August 24, 2000, incorporating the quarterly results. Burke knew, or was reckless in not knowing, that these filings were materially misleading because, among other things, he was aware that revenue was being recognized by Interspeed in those Forms 10-Q and the Form S-8 on transactions with Solunet where there was no payment obligation by the customer.  Burke also knew, or was reckless in not knowing, that revenue was being recognized by Interspeed in its Form 10-Q for the second quarter of FY 2000 and in its Form S-8 registration statement despite the existence of a "round-tripping" arrangement with I-Way.  Burke also knew, or was reckless in not knowing, that revenue was being recognized by Interspeed in its Form 10-Q for the third quarter of FY 2000 and in its Form S-8 registration statement despite the last-minute production of a purported contract, provided by Goodwin under unusual circumstances at a time when Burke knew Goodwin had entered into secret side agreements with other customers in order to recognize revenue, that supposedly substantiated the ability of a customer to pay for a shipment of product by Interspeed.  Burke knew or was reckless in not knowing that Interspeed's misstated financial results would render the company's public filings materially misleading.

56.     As set forth above, Whalen substantially participated in Interspeed's filing of materially misleading Forms 10-Q for the second and third quarters of FY 2000, and a materially misleading Form S-8 registration statement, which was signed and filed on or about August 24, 2000, incorporating the quarterly results.  Whalen knew, or was reckless in not knowing, that these filings were materially misleading because, among other things, he was aware that revenue was being recognized by Interspeed in those Forms 10-Q and the Form S-8 on transactions with Solunet and Lastar where there was no payment obligation by the customer.  Whalen also knew, or was reckless in not knowing, that revenue was being recognized by Interspeed in its Form 10-Q for the second quarter of FY 2000 and in its Form S-8 registration statement despite the existence of a "round-tripping" arrangement with I-Way by which Interspeed money was being used to pay for Interspeed products.  Whalen knew or was reckless in not knowing that Interspeed's misstated financial results would render the company's public filings materially misleading.

57.     By reason of the foregoing, Goodwin, Burke and Whalen, directly or indirectly, acting intentionally, knowingly or recklessly, in the offer or sale of securities by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon the purchasers of Interspeed's securities.

58.     As a result, Goodwin, Burke and Whalen violated Section 17(a) of the Securities Act [15 U.S.C. §77q(a)] and their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses to other persons, within the meaning of Section 20(d)(2) of the Securities Act [15 U.S.C. §77t(d)(2)].

## SECOND CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5
by Goodwin, Burke and Whalen)

59.     The Commission repeats and incorporates by reference the allegations in

paragraphs 1-58 of the Complaint as if set forth fully herein.

60.     As set forth above, Goodwin substantially participated in Interspeed's filing of

materially misleading Forms 10-Q for the first, second and third quarters of FY 2000, and a

materially misleading Form S-8 registration statement, which was signed and filed on or about

August 24, 2000, incorporating the quarterly results.  Goodwin knew, or was reckless in not

knowing, that these filings were materially misleading because, among other things, he was aware

that revenue was being recognized by Interspeed in those Forms 10-Q and the Form S-8 on

transactions with Solunet and Lastar where there was no payment obligation by the customer.

Goodwin also knew, or was reckless in not knowing, that revenue was being recognized by

Interspeed in its Form 10-Q for the second quarter of FY 2000 and in its Form S-8 registration

statement despite the existence of a "round-tripping" arrangement with I-Way.  Goodwin also

knew, or was reckless in not knowing, that revenue was being recognized by Interspeed in its

Form 10-Q for the third quarter of FY 2000 and in its Form S-8 registration statement because of

the last-minute production of a purported contract by him that supposedly substantiated the ability

of a customer to pay for a shipment of product by Interspeed, when he knew that the purported

contract was a forgery and fraudulent because he had created it.  Goodwin knew or was reckless in

not knowing that Interspeed's misstated financial results would render the company's public

filings materially misleading.

61.     As set forth above, Burke signed Interspeed's materially misleading Forms 10-Q

for the first, second and third quarters of FY 2000, and a materially misleading Form S-8

registration statement, which was signed and filed on or about August 24, 2000, incorporating the

quarterly results. Burke knew, or was reckless in not knowing, that these filings were materially misleading because, among other things, he was aware that revenue was being recognized by Interspeed in those Forms 10-Q and the Form S-8 on transactions with Solunet where there was no payment obligation by the customer. Burke also knew, or was reckless in not knowing, that revenue was being recognized by Interspeed in its Form 10-Q for the second quarter of FY 2000 and in its Form S-8 registration statement despite the existence of a "round-tripping" arrangement with I-Way. Burke also knew, or was reckless in not knowing, that revenue was being recognized by Interspeed in its Form 10-Q for the third quarter of FY 2000 and in its Form S-8 registration statement despite the last-minute production of a purported contract, provided by Goodwin under unusual circumstances at a time when Burke knew Goodwin had entered into secret side agreements with other customers in order to recognize revenue, that supposedly substantiated the ability of a customer to pay for a shipment of product by Interspeed. Burke knew or was reckless in not knowing that Interspeed's misstated financial results would render the company's public filings materially misleading.

62.     As set forth above, Whalen substantially participated in Interspeed's filing of materially misleading Forms 10-Q for the second and third quarters of FY 2000, and a materially misleading Form S-8 registration statement, which was signed and filed on or about August 24, 2000, incorporating the quarterly results. Whalen knew, or was reckless in not knowing, that these filings were materially misleading because, among other things, he was aware that revenue was being recognized by Interspeed in those Forms 10-Q and the Form S-8 on transactions with Solunet and Lastar where there was no payment obligation by the customer. Whalen also knew, or was reckless in not knowing, that revenue was being recognized by Interspeed in its Form 10-Q for the second quarter of FY 2000 and in its Form S-8 registration statement despite the existence of a "round-tripping" arrangement with I-Way. Whalen knew or was reckless in not knowing that

Interspeed's misstated financial results would render the company's public filings materially misleading.

63.    By reason of the foregoing, Goodwin, Burke and Whalen, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities by use of the means or instrumentalities of interstate commerce or by use of the mails: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omissions to state a material fact necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon certain persons, including the purchasers and sellers of Interspeed's securities.

64.    As a result, Goodwin, Burke and Whalen violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], and their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

### THIRD CLAIM FOR RELIEF
#### (Violation of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 by Goodwin, Burke and Whalen)

65.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-64 of the Complaint as if set forth fully herein.

66.    As set forth above, Goodwin knowingly circumvented Interspeed's system of internal accounting controls and caused others to record false entries on Interspeed's books, including the entries that improperly recognized revenue for the first, second and third quarters of FY 2000.

67.     As set forth above, Burke knowingly circumvented Interspeed's system of internal accounting controls and recorded, and caused others to record, false entries on Interspeed's books, including the entries that improperly recognized revenue for the first, second and third quarters of FY 2000.  Burke also failed to devise and maintain internal controls at the company relating to distribution and enforcement of a revenue recognition policy at the company.

68.     As set forth above, Whalen knowingly circumvented Interspeed's system of internal accounting controls and caused others to record false entries on Interspeed's books, including the entries that improperly recognized revenue for the second and third quarters of FY 2000.

69.     By reason of the foregoing, Goodwin, Burke and Whalen knowingly circumvented Interspeed's system of internal accounting controls and, directly or indirectly, falsified or caused to be falsified Interspeed's books, records and accounts.

70.     As a result, Goodwin, Burke and Whalen violated Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1], and their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## FOURTH CLAIM FOR RELIEF
### (Violation of Exchange Act Rule 13b2-2 by Goodwin and Burke)

71.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-70 of the Complaint as if set forth fully herein.

72.     As set forth above, Goodwin was Interspeed's senior vice-president of worldwide sales.  In connection with an outside audit in the summer of 2000, Goodwin presented a forged and fraudulent purported contract between Compaq and UeComm representing it to be

documentation of IPN's ability to pay for goods purchased from Interspeed. Goodwin knew, or was reckless in not knowing, that the contract was forged and fraudulent.

73.     As set forth above, Burke was Interspeed's CFO. In management representation letters, Burke stated that the financial information given by the company to its accountants was presented in conformity with generally accepted accounting principles, when he knew, or was reckless in not knowing, that the financial information was not accurate. Burke also knew, or was reckless in not knowing, that revenues attributable to sales with Solunet were based on contingencies set out in side letters and that the Solunet receivable had been paid, at least in part, by funds that Interspeed provided to I-Way, but he did not disclose these facts to Interspeed's auditors.

74.     By reason of the foregoing, Goodwin and Burke directly or indirectly made or caused to be made a materially false or misleading statement, or omitted to state, or caused another person to omit to state, a material fact necessary in order to make statements made, in light of the circumstances under which the statements were made, not misleading, to an accountant in connection with (i) an audit or examination of the financial statements of an issuer required to be made or (ii) the preparation or filing of a document or report required to be filed with the Commission.

75.     As a result, Goodwin and Burke violated Rule 13b2-2 promulgated under the Exchange Act [17 C.F.R. §240.13b2-2], and their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Interspeed's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 by Goodwin, Burke and Whalen)

76.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-75 of the Complaint as if set forth fully herein.

77.     Interspeed's quarterly reports to the Commission on Forms 10-Q for the first, second and third quarters of FY 2000 and its Form S-8 registration statement, which was signed and filed on or about August 24, 2000, materially misstated the company's revenues and financial results.  As a result, Interspeed violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

78.     As set forth above, Burke signed one or more of Interspeed's materially misleading public filings, and Goodwin and Whalen substantially participated in one or more of those public filings.

79.     By reason of the foregoing, Goodwin, Burke and Whalen, provided knowing and substantial assistance to one or more of Interspeed's materially misleading public filings.

80.     As a result, Goodwin, Burke and Whalen each aided and abetted Interspeed's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Interspeed's Violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13 by Goodwin, Burke and Whalen)

81.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-80 of the Complaint as if set forth fully herein.

82.     Interspeed's quarterly reports to the Commission on Forms 10-Q for the first, second and third quarters of FY 2000 and its Form S-8 registration statement, which was signed and filed on or about August 24, 2000, materially misstated the company's revenues and financial

results. As a result, Interspeed violated Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 thereunder [17 C.F.R. §240.12b-20, 240.13a-13].

83.     As set forth above, Burke signed one or more of Interspeed's materially misleading filings with the Commission, and Goodwin and Whalen substantially participated in one or more of those public filings.

84.     By reason of the foregoing, Goodwin, Burke and Whalen, provided knowing and substantial assistance to Interspeed's filing of one or more materially misleading financial reports.

85.     As a result, Goodwin, Burke and Whalen each aided and abetted Interspeed's violations of Section 13(a) of the Exchange Act and Rules 12b-20 and 13a-13.

**SEVENTH CLAIM FOR RELIEF**
**(Aiding and Abetting Interspeed's Violations of Section 13(b)(2)(A) of the Exchange Act**
**by Goodwin, Burke and Whalen)**

86.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-85 of the Complaint as if set forth fully herein.

87.     Interspeed maintained false and misleading books, records and accounts which, among other things, materially overstated the company's revenue for the first, second and third quarters of FY 2000. As a result, Interspeed violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)].

88.     As set forth above, Goodwin, Burke and Whalen, provided knowing and substantial assistance to the improper accounting practices at Interspeed.

89.     As a result, Goodwin, Burke and Whalen each aided and abetted Interspeed's violations of Section 13(b)(2)(A) of the Exchange Act.

## EIGHTH CLAIM FOR RELIEF
### (Aiding and Abetting Interspeed's Violations of Section 13(b)(2)(B)
### of the Exchange Act by Burke)

90.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-89 of the Complaint as if set forth fully herein.

91.     Interspeed failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP.  As a result, Interspeed violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)].

92.     As set forth above, Burke failed to ensure that Interspeed properly was recording revenue and that controls were in place to ensure that revenue was not recorded when contingencies existed.

93.     By reason of the foregoing, Burke provided knowing and substantial assistance to the absence of a system of internal accounting controls at Interspeed sufficient to provide reasonable assurances that transactions were recorded as necessary to permit  preparation of financial statements in conformity with GAAP.

94.     As a result, Burke aided and abetted Interspeed's violations of Section 13(b)(2)(B) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a permanent injunction restraining Goodwin, Burke and Whalen and each of their respective agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or

indirectly engaging in violations of:

1. Section 17(a) of the Securities Act [15 U.S.C. §77q(a)];

2. Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

3. Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1];

4. Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20 and 13a-13 thereunder [17 C.F.R. §240.12b-20, 240.13a-13]; and,

5. Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)];

B.   Enter a permanent injunction restraining Goodwin and Burke and each of their respective agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in violations of Rule 13b2-2 promulgated under the Exchange Act [17 C.F.R. §240.13b2-2];

C.   Enter a permanent injunction restraining Burke and each of his agents, servants, employees and attorneys and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)];

D.   Order Goodwin, Burke and Whalen to disgorge their ill-gotten gains, including prejudgment interest;

E.   Order Goodwin, Burke and Whalen to pay an appropriate civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3);

F.     Enter an order, pursuant to Section 20(e) of the Securities Act [15 U.S.C. §77t(e)]

and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], barring Goodwin and Burke

from serving as an officer or director of any issuer required to file reports with the Commission

pursuant to Sections 12(b), 12(g) or 15(d) of the Exchange Act [15 U.S.C. §78l(b), 78l(g) and

78o(d)];

G.     Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

H.     Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

Juan Marcel Marcelino
District Administrator

Celia D. Moore (Mass. Bar No. 542136)
Deputy Assistant District Administrator

Martin F. Healey (Mass. Bar No. 227550)
Senior Trial Counsel

Robert Barry (Mass. Bar No. 546645)
Senior Enforcement Counsel

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
73 Tremont Street, Suite 600
Boston MA 02108

(617) 424-5900 x204(Healey)
(617) 424-5940 (facsimile)

Dated: September 30, 2002